UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

---

| | |
|---|---|
| LANCE DILLON, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Case No. 04-CV-2029 |
| ) | |
| STEVEN M. FERMON, ) | |
| ) | |
| Defendant. ) | |

## OPINION

This case is before the court for ruling on the Motion for Summary Judgment (#15) filed by Defendant, Steven M. Fermon. Following this court's careful review of the arguments of the parties and the documents filed by the parties, Defendant's Motion for Summary Judgment (#15) is DENIED. This case remains scheduled for a final pretrial conference on December 28, 2005, at 11:00 a.m. and for a jury trial on January 9, 2006, at 9:00 a.m.

## FACTS

The following facts are based upon this court's review of the statements of undisputed facts and the supporting documents provided by both parties. This court notes that, at this stage of the proceedings, the court must consider the evidence in the light most favorable to the party opposing summary judgment. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

Plaintiff, Lance Dillon, has been employed as a sworn officer with the Illinois State Police since November 4, 1984. Plaintiff has held various positions with the Illinois State Police since he was hired. In 1999, Plaintiff was a special agent with the Vermilion County Metropolitan Enforcement Group (VMEG). In December 1999, Plaintiff was transferred from VMEG to Zone 5 and worked as an investigator. His direct supervisors while he worked in Zone 5 were Mike Bernardini and Michale Callahan.

In April 2000, Plaintiff attended a meeting at the VMEG office regarding a case Plaintiff was involved in while he was working with VMEG during the summer of 1999. The defendant, Terry R. Hawthorne, was scheduled for sentencing in Warren County, Indiana. Plaintiff testified during his deposition that Lou Shanks, who was hired by Fermon and was then working with VMEG, gave the prosecutor, John Larson, false information at the meeting. Plaintiff testified that, after the meeting, he waited around so he could talk to the prosecutor alone. He testified that he did not feel comfortable talking at the meeting because Sue Culp, who was the deputy director of VMEG at that time, was present. Plaintiff was not able to speak to Larson that day because Larson was in a meeting with Culp. Plaintiff testified that he telephoned Larson the next morning and told Larson that he did not agree with what Shanks had said at the meeting. Plaintiff informed Larson that he was not going to provide the same testimony. Plaintiff testified that he told Larson that "if he didn't want us conflicting on the stand, don't call me." At his deposition, Plaintiff provided the following explanation:

> [A]ccording to Lou Shanks, the defendant always dealt drugs in Indiana, he didn't deal in Illinois. That was untrue. We'd already made two or three buys from him in Danville. Shanks said that the defendant was the one that set the deal up in Indiana, which was untrue. We did that. The [confidential source] in the case originally was a little uneasy about doing it in Indiana because he said the guy's never done it in Indiana before. But then Shanks went on to tell the prosecutor – like I say, he'd already pled guilty before this meeting. This was going to be for his sentencing hearing. And Shanks said

> that Hawthorne was a big dealer in Indiana, specifically the Crawfordsville area, where we had no information of that. Like I said, when he – when he came to sell us the drugs in Indiana, we were only maybe two miles in Indiana. He was almost an hour and a half late because he kept going past where the meet spot was. He had no idea where he was at in Indiana. Like I said, Shanks said it was the defendant's – the defendant was the one that set up the deal in Indiana, not us, which was completely untrue.

Plaintiff stated that he told Larson, "I'm not going to testify that he's a big dealer in Indiana. I'm not going to testify that he was the one who set the deal up in Indiana because he wasn't." Plaintiff has alleged that Shanks wanted the drug buy to occur in Indiana due to the tougher penalties in that state for drug dealing, as opposed to Vermilion County, Illinois.

Shanks testified at the sentencing hearing, but Larson did not call Plaintiff to testify. Plaintiff did not attend the sentencing hearing, but testified that he reviewed the transcript of the hearing. Plaintiff testified that, in his opinion, Shanks lied at the sentencing hearing.

After this incident, Danny Reed, who was director of VMEG at that time, forwarded information to Callahan pertaining to Plaintiff and the Warren County prosecutor. Plaintiff testified that Reed's complaint was that Plaintiff called the prosecutor and said that Shanks was going to make false statements. Callahan investigated and determined that Plaintiff had done nothing wrong. Fermon testified that he learned that Plaintiff gave information about the Indiana court proceedings from Reed. However, Fermon testified that he did not talk to Reed about it when Reed was the head of VMEG and did not think he heard about it until after Plaintiff was transferred. Plaintiff testified

that Fermon knew about his telephone call to Larson through Reed. At the time Plaintiff made his statements to Larson, Fermon was Statewide Investigations Administrator for the Illinois State Police. When Fermon held this position, he had an office in Springfield and an office in the VMEG office in Danville.

It is undisputed that Fermon was close friends with Shanks and Reed. Reed testified that he socializes with Fermon at least once a week. Fermon testified that he had frequent contact with Reed and probably talked to Reed a couple times a week when Reed was the head of VMEG. Fermon testified that he has known Shanks since 1993 and, in addition to a professional relationship, he has a social relationship with Shanks and considers him a friend.

It is undisputed that Plaintiff has a lengthy disciplinary history. Plaintiff's disciplinary record began with a letter of reprimand issued in 1987 and included a 60-day suspension issued on January 23, 2001, and a 90-day suspension issued on November 8, 2001. Both of these suspensions were imposed for various misconduct, including being untruthful during an administrative interview and providing false information. However, the record shows that Bernardini gave Plaintiff a high rating on his evaluation around July 2001. Edie Casella, who was the director of Zone 5 from January 2001 to November 2001, testified that she had no concerns about Plaintiff's job performance and felt that Bernardini's ratings of Plaintiff were fair. In addition, Callahan testified that he felt Plaintiff was a very professional police officer who did good, thorough work. Callahan stated that he had no problem assigning sensitive cases to Plaintiff.

In 2001, Ronald Haring, a retired state police officer who had a contract to perform background investigations for the state police, conducted a background investigation of Shanks. At that time, Shanks had applied for a position with the Illinois State Police as Financial Crimes

Investigator. During Haring's investigation, Plaintiff spoke to Haring and confirmed information regarding Shanks providing false testimony during the sentencing hearing in Indiana. Because of this and other negative information regarding Shanks, Haring recommended that Shanks not be hired for the position. Haring was also critical of the fact that Shanks had been hired to work for VMEG with no background investigation. It is undisputed that Fermon hired Shanks into the VMEG position. On September 28, 2001, Fermon sent an e-mail to Rick Karhliker of the Illinois State Police and stated that he would like to have the opportunity to serve as a reference for Shanks and further stated that he was concerned that Haring had placed credence to statements and possibly allegations made by Plaintiff and Mark Christoff. Christoff was Hawthorne's attorney in the Indiana case.

In November 2001, Fermon became the director of Zone 5. Fermon testified that, at the time he was assigned to Zone 5, he was "operating on a belief that [Plaintiff] had provided information unfavorable to Mr. Shanks to Mr. Haring during his background investigation." Daniel W. Kent was the Deputy Director of Operations for the Illinois State Police from January 25, 1999, to December 31, 2002. Kent and Fermon are friends. In his affidavit, Kent stated that he spoke to Fermon in November 2001 about the conduct and untruthfulness of Plaintiff in administrative reviews and Illinois State Merit Board proceedings. Kent stated that he advised Fermon that he had concerns about the credibility of Plaintiff and his continued assignment in investigations. Kent stated that he advised Fermon to document his concerns about Plaintiff "as it related to his investigative assignments, untruthfulness, and lack of credibility and forward any recommendations to me for review."

On January 18, 2002, Fermon sent a memo to Diane Carper, who was Region 3 Commander

5

at that time. Carper was Fermon's direct supervisor. In his memo, Fermon recommended that Plaintiff be transferred to a patrol position. Fermon testified that he and Reed prepared the memo. In the memo, Fermon stated that, following his assignment as Zone 5 Commander, he was required to coordinate and schedule Plaintiff's 90-day suspension. He stated that, subsequently, he reviewed Plaintiff's personnel file. Fermon stated that, during his review of the three Department of Internal Investigations (DII) investigative findings, he noted that recurring in each case was a finding that Plaintiff was untruthful to supervisors and DII investigators. Fermon stated that he found Plaintiff's continued pattern of untruthfulness was a matter of considerable concern and "has seriously damaged his ability to provide unquestioned credible testimony in the courts." Fermon noted that, based upon the case of Giglio v. United States, 405 U.S. 150 (1972), the findings regarding Plaintiff's untruthfulness may have to be disclosed as potential impeachment evidence if Plaintiff was going to be a witness at trial.

    Shortly after she received Fermon's memo, Carper went to Utah on assignment during the winter Olympics. Richard Karpawicz filled in for Carper as Region 3 Commander while she was in Utah. Carper testified that she told Karpawicz that there needed to be additional research done before action was taken on Fermon's recommendation. Karpawicz testified that Carper told him that she would handle the matter when she returned from the Olympics. Carper testified that the issue of Plaintiff's transfer should appropriately have gone through the chain of command, which, at that time, was Fermon to Carper to Carper's supervisor, Andre Parker, and then to Kent. However, Karpawicz testified that he was instructed by Kent to process the reassignment of Plaintiff. Callahan testified that Fermon told him that he wanted to get Plaintiff's transfer done while Carper was gone. Callahan also testified that they had a lot of inexperienced investigators at that time and, in his

opinion, Plaintiff's experience as an investigator was very much needed. On February 5, 2002, Karpawicz sent a memo to Kent and stated that he concurred with Fermon's recommendation that Plaintiff be reassigned to a patrol position. In his affidavit, Kent stated that he then recommended Plaintiff's reassignment to the Director of the Illinois State Police. Kent stated that, prior to this recommendation, he was not informed of any allegations that Plaintiff had made that Shanks had testified or intended to testify untruthfully. Kent stated that Plaintiff was reassigned to District 10 patrol effective March 1, 2002.

On February 20, 2002, a memo was issued from Carper to Plaintiff which stated that he would be reassigned to patrol effective March 1, 2002. Karpawicz testified that he actually wrote the memo but put Carper's name on it. Carper testified that she was concerned that her name was on the memo and she was not a part of the decision to reassign Plaintiff. On February 21, 2002, Fermon sent an e-mail to Kent which stated that the e-mail was "Re: Dillon." The e-mail stated, "I could kiss you . . . . . but I will not, thanks so much!" At his deposition, Fermon testified that he could not remember this e-mail but stated that he was pleased that Plaintiff was reassigned to patrol. Plaintiff testified that Fermon informed him that he was being transferred and refused to give Plaintiff any explanation for the transfer.

At some point, Haring complained about Fermon. Haring reported that, during his background investigation of Shanks, he was "questioned and intimidated" by Fermon. Haring also questioned why Shanks was hired for the position as Financial Crimes Investigator when Haring's background investigation revealed he was not suitable for employment with the Illinois State Police. Freddie Outlaw was one of the officers assigned to investigate Haring's allegations. Outlaw spoke to Fermon on October 22, 2002 about Haring's complaint. Outlaw testified that Fermon was

"obviously upset" when he spoke about Plaintiff and stated, "you could tell that he was upset about things that [Plaintiff] may or may not have said and this was his opportunity to voice his opinion on what he thought about [Plaintiff's] accusations."  Shanks was ultimately terminated by the Illinois State Police in 2003.

On February 19, 2004, Plaintiff filed his Complaint (#1) against Fermon.  Plaintiff alleged that Fermon retaliated against him for his efforts at speaking out on matters of public concern and violated his rights as protected under the First and Fourteenth Amendments to the United States Constitution.  Plaintiff brought his action under 42 U.S.C. § 1983.  As noted, Fermon has filed a Motion for Summary Judgment (#15).  The Motion is fully briefed and ready for ruling.

## ANALYSIS

### I. SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Schad v. Jones, 415 F.3d 671, 673 (7th Cir. 2005).  In ruling on a motion for summary judgment, a district court has one task and one task only: to decide, based upon the evidence of record, whether there is any material dispute of fact that requires a trial.  Waldridge v. American Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994).  "A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole."  Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000), quoting Pipitone v. United States, 180 F.3d 859, 861 (7th Cir. 1999).  In making this determination, the inferences to be drawn from the

underlying facts must be viewed in the light most favorable to the party opposing summary judgment. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970); see also Carreon v. Ill. Dept. of Human Servs., 395 F.3d 786, 790 (7th Cir. 2005). "Summary judgment is inappropriate when alternate inferences can be drawn from available evidence." Spiegla v. Hull, 371 F.3d 928, 935 (7th Cir. 2004), citing Hines v. British Steel Corp., 907 F.2d 726, 728 (7th Cir. 1990). The burden of establishing that no genuine issue of material fact exists rests with the movant. Jakubiec v. Cities Serv. Co., 844 F.2d 470, 473 (7th Cir. 1988).

## II. PLAINTIFF'S CLAIM

In his Complaint (#1), Plaintiff alleged that Fermon retaliated against him for his efforts at speaking out on matters of public concern and violated his rights as protected under the First and Fourteenth Amendments to the United States Constitution. It is undisputed that the telephone conversation between Plaintiff and Larson, the Warren County, Indiana, prosecutor, is the alleged protected speech that forms the basis of Plaintiff's claims.

A plaintiff establishes a prima facie case of First Amendment retaliation by showing: (1) his speech was constitutionally protected; and (2) it was a "substantial or motivating factor" in the employer's decision to retaliate against the plaintiff. Carreon, 395 F.3d at 791. If the plaintiff establishes these elements, the burden shifts to the defendant to prove that the same action would have been taken in the absence of the protected speech. See Carreon, 395 F.3d at 791.

Fermon first argues that Plaintiff's speech is not protected by the First Amendment. In determining whether a government employee's speech is constitutionally protected, a court must apply the two-step Connick-Pickering test. Schad v. Jones, 415 F.3d 671, 674 (7th Cir. 2005), citing Connick v. Myers, 461 U.S. 138 (1983); Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, 391

9

U.S. 563 (1968). Whether speech is constitutionally protected under this two-part test is a question of law for the court. Carreon, 395 F.3d at 791.

First, under Connick, the court must determine whether the plaintiff spoke "as a citizen upon matters of public concern." Schad, 415 F.3d at 674, quoting Connick, 461 U.S. at 147. In making this determination, the court examines "the content, form, and context of a given statement, as revealed by the whole record." Schad, 415 F.3d at 674, quoting Connick, 461 U.S. at 147-48. "Of these considerations, content is most important." Carreon, 395 F.3d at 791. "The 'public concern' element must relate to a community concern and is not satisfied by 'merely a personal grievance of interest only to the employee.'" Carreon, 395 F.3d at 791, quoting Sullivan v. Ramirez, 360 F.3d 692, 699 (7th Cir. 2004). Second, under Pickering, the court must balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Schad, 415 F.3d at 674, quoting Pickering, 391 U.S. at 568.

Fermon argues that Plaintiff's deposition revealed that, when Plaintiff made his statements to Larson, he "was neither disclosing potential perjury, nor attempting to rectify that perjury." Fermon contends that Plaintiff's speech was a "routine strategic discussion" with a prosecutor. He argues that, in fact, "plaintiff's speech was designed to prevent the untruthfulness of the speech from coming to light, by suggesting to the prosecutor that he not call plaintiff as a witness." Fermon asserts that "[a]ny attempt by plaintiff to hide the perjury of a fellow police employee is not speech by a citizen on a matter of public concern." In response, Plaintiff argues that Fermon's argument completely distorts both the factual record and relevant legal authority. Plaintiff contends that the case law establishes that charges of wrongdoing by public officials is a matter that clearly touches

on matters of public concern, citing McGreal v. Ostrov, 368 F.3d 657, 679 (7th Cir. 2004).  Plaintiff contends that, in his communication with Larson, he was not pointing out a routine matter but rather was advising a prosecutor that another law enforcement officer was not telling the truth about an important matter.

The Seventh Circuit has stated that "our cases have consistently held that speech alleging government corruption and malfeasance is of public concern in its substance."  Schad, 415 F.3d at 675, quoting Spiegla, 371 F.3d at 937 (collecting cases).  As the court stated in Spiegla:

> Unscrupulous public employees may find ways to exploit the resources and opportunities available to them through their offices.  Perhaps the public's best protection against these few wayward individuals is the insider who is willing to speak up and shed light on [his] colleagues' improprieties.

Spiegla, 371 F.3d at 937.  However, "[s]peech that serves a private or personal interest, as opposed to a community one, does not satisfy the standards for First Amendment protection."  Spiegla, 371 F.3d at 935.  In considering the context of speech, "it is necessary to look at the point of the speech in question: was it the employee's point to bring wrongdoing to light?"  Spiegla, 371 F.3d at 938, quoting Kokkinis v. Ivkovich, 185 F.3d 840, 844 (7th Cir. 1999).

The speech at issue in this case consists of Plaintiff's statement to Larson, the Warren County, Indiana, prosecutor, that the testimony Shanks intended to give at the sentencing of Terry Hawthorne was false.  Plaintiff testified at his deposition that he also told Larson that he would testify differently and specifically told Larson that "I'm not going to testify that he's a big dealer in Indiana.  I'm not going to testify that he was the one who set the deal up in Indiana because he

11

wasn't." Fermon has focused solely on one part of Plaintiff's testimony, that he told Larson that Larson should not call him to testify if Larson did not want conflicting testimony. However, in reviewing the record as a whole, it is clear that Plaintiff was concerned when Shanks gave false information to Larson at the meeting at the VMEG office. Plaintiff telephoned Larson the next morning to let him know that Shanks' version of events was false and that he would testify to a different version of events. Plaintiff later spoke to Haring during Haring's background investigation of Shanks and confirmed that Shanks provided false testimony. This court concludes that this is evidence that Plaintiff continued to be concerned about Shanks' conduct. This court concludes that Plaintiff's statement to Larson that Larson should not call him if Larson did not want conflicting testimony cannot be interpreted, in light of the whole record, as an attempt by Plaintiff to foster the presentation of false testimony by Shanks. This court concludes that, through this speech, Plaintiff was bringing to light an impropriety by Shanks, a public employee. This court notes that there is nothing in the record to show that Plaintiff was speaking to serve a private or personal interest. Based upon the relevant case law and the content of Plaintiff's speech, as revealed by the whole record, this court concludes that Plaintiff spoke on a matter of public concern. The content of the speech touched on a matter of concern to the community, false testimony by a police officer at a sentencing hearing. Therefore, this court does not agree with Fermon that he is entitled to summary judgment based upon the <u>Connick</u> test.

As far as the second prong of the analysis, the <u>Pickering</u> test, courts consider seven factors: (1) whether the statement would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform his daily

responsibilities; (4) the time, place, and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to the informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public. Vargas-Harrison v. Racine Unified Sch. Dist., 272 F.3d 964, 971 n.2 (7th Cir. 2001), citing Kokkinis, 185 F.3d at 845.

This court agrees with Plaintiff that, in his Memorandum, Fermon has not analyzed any of the Pickering factors. Fermon has only argued that, under these facts, Plaintiff's interest in speaking is entitled to no weight. Fermon again argues that the only interest advanced by Plaintiff's speech was the interest in securing a conviction or sentence notwithstanding the truth. In short, Fermon is advancing the same argument he made when discussing the first, Connick, prong of the analysis, an argument this court has rejected. Accordingly, this court concludes that Fermon has failed to make a Pickering-based argument. This court therefore concludes that it cannot reach the Pickering balancing phase and that Fermon has not shown that he is entitled to summary judgment on this basis. See Spiegla, 371 F.3d at 940.

Fermon next argues that he is entitled to summary judgment because Plaintiff cannot establish the second part of his prima facie case, that his speech was a "motivating factor" in the decision to reassign him to patrol. Fermon argues that Plaintiff has no admissible evidence to show that he was reassigned because of his speech. Fermon contends that the evidence shows that Fermon did not know about Plaintiff's statements to Larson prior to Plaintiff's reassignment and that Plaintiff was reassigned because of his abysmal disciplinary record, which included numerous instances where Plaintiff was found to have been untruthful during an administrative interview and was found to have provided false information.

Plaintiff argues in response that there is evidence in this case from which a jury could conclude that Fermon knew about Plaintiff's statements to Larson prior to the reassignment decision and that the statements were a motivating factor in the decision to reassign him.  This court agrees.

In order to prevail on his First Amendment retaliation claim, Plaintiff must establish a causal link between the between the protected speech and his reassignment to a patrol position.  See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Spiegla, 371 F.3d at 941. That is, he must establish by a preponderance of the evidence that a motivating factor in Fermon's action was retaliation.  See Spiegla, 371 F.3d at 941.  The Seventh Circuit has recently stated:

> [W]e follow the approach delineated in the majority of our cases, adopted in our sister circuits, and compelled by Mt. Healthy itself, i.e., a plaintiff alleging First Amendment retaliation must prove by a preponderance of the evidence that his or her protected activity was a motivating factor in the defendant's retaliatory action.  To clarify, a motivating factor does not amount to a but-for factor or to the only factor, but is rather a factor that motivated the defendant's actions.

Spiegla, 371 F.3d at 942 (emphasis added).

First of all, Fermon's testimony regarding when he learned about Plaintiff's statements to Larson was fairly equivocal.  He testified that he learned from Reed that Plaintiff gave information but did not think he knew about Plaintiff's statements prior to the decision to reassign Plaintiff. However, the evidence indicates that Reed knew about the statements close to the time they were made and complained about Plaintiff's conduct, resulting in an investigation by Callahan.  It is undisputed that Fermon and Reed are close friends and the evidence shows that they had frequent

14

contact with each other at that time. This court concludes that a jury could find that Fermon learned about Plaintiff's statements from Reed long before the reassignment decision was made. In any case, Fermon's September 28, 2001, e-mail regarding statements about Shanks made by Plaintiff and Christoff, Hawthorne's attorney, is evidence from which a jury could conclude that Fermon knew about Plaintiff statements at least as of September 28, 2001. This court concludes that the evidence regarding Haring's investigation of Shanks, and Fermon's response to the investigation, is some evidence that Fermon knew of Plaintiff's speech to Larson accusing Shanks of making false statements.

This court also agrees with Plaintiff that a jury could conclude from the evidence that Plaintiff's statements were a motivating factor in Fermon's decision to seek the reassignment of Plaintiff to a patrol position. The evidence shows that Fermon reacted strongly to Haring's background investigation of his close friend, Shanks. Haring complained that, during the investigation, Fermon "questioned and intimidated" him. The evidence also shows that Fermon knew that Plaintiff spoke to Haring during his investigation and that Haring was aware of allegations that Shanks provided false testimony during the Indiana sentencing. Outlaw testified that Fermon was upset about the information Plaintiff provided.

Fermon had no authority over Plaintiff until he became the director of Zone 5 in November 2001. Fermon admitted that, at that time, he was "operating on a belief that [Plaintiff] had provided information unfavorable to Mr. Shanks to Mr. Haring during his background investigation." Almost immediately, Fermon and his friend, Kent, began having discussions about reassigning Plaintiff. Shortly thereafter, in January 2002, Fermon wrote his memo to Carper recommending that Plaintiff be transferred to a patrol position. Carper determined that additional research was necessary prior

15

to acting on Fermon's recommendation. Instead of waiting for Carper's return from Utah, Kent instructed her replacement, Karpawicz, to process the reassignment of Plaintiff. Callahan testified that Fermon told him that he wanted to get Plaintiff's transfer done while Carper was gone. This disregard for the chain of command is somewhat suspicious. While Fermon argues that the chain of command can properly be avoided where a superior officer, such as Kent, makes a specific request, this court concludes that no adequate explanation has been provided for avoiding the chain of command in this situation. The evidence also shows that, after the reassignment was accomplished, Fermon sent a memo to Kent thanking him. In addition, Fermon refused to give Plaintiff a reason for his transfer. It seems that if Plaintiff's disciplinary record was the reason, Fermon would have told him that. Considering the evidence in the light most favorable to Plaintiff, as this court must at this stage of the proceedings, this court concludes that a jury could find that Plaintiff's statements were a motivating factor in Fermon's decision to seek the reassignment of Plaintiff to patrol. This court further agrees with Plaintiff that Fermon has not argued that he has met his burden to show that the same action would have been taken in the absence of the protected speech.

For the reasons stated, this court concludes that there is a genuine issue of material fact regarding whether Fermon knew of Plaintiff's speech prior to the decision to reassign him to patrol and regarding whether Plaintiff's speech was a motivating factor in Fermon's decision to seek Plaintiff's reassignment to patrol. Therefore, Fermon is not entitled to summary judgment on this basis.

Fermon also argues that he is entitled to summary judgment based upon qualified immunity. The defense of qualified immunity "is designed to protect government agents 'from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Spiegla, 371 F.3d at 940, quoting Knox v. Smith, 342 F.3d 651, 657 (7th Cir. 2003) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). However, this court notes that it has found that Plaintiff spoke on a matter of public concern and that this court could not conduct a Pickering analysis because Fermon did not present any argument regarding the Pickering factors. Without addressing the Pickering factors, this court cannot conclude that Plaintiff's First Amendment rights were violated – a prerequisite to determining whether the right was clearly established. "[B]ecause the Pickering analysis is essential to the determination of whether a constitutional violation occurred in this case," this court cannot reach the issue of qualified immunity on summary judgment. See Spiegla, 371 F.3d at 940.[1] This court will address the issue of qualified immunity at the conclusion of the trial, based upon all of the evidence presented.

IT IS THEREFORE ORDERED THAT:

(1) Defendant's Motion for Summary Judgment (#15) is DENIED.

(2) This case remains scheduled for a final pretrial conference on December 28, 2005, at 11:00 a.m. and for jury trial on January 9, 2006, at 9:00 a.m.

ENTERED this 6th day of December, 2005

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY

---

[1] This court notes that, because it has found that genuine issues of material fact exist on the issue of qualified immunity, this issue cannot properly be raised in an interlocutory appeal to the Seventh Circuit. See Leaf v. Shelnutt, 400 F.3d 1070, 1078 (7th Cir. 2005) ("this court may not reconsider the district court's determination that certain genuine issues of fact exist; such determinations are unappealable because they are not 'final decisions' within the meaning of 28 U.S.C. § 1291.").

CHIEF U.S. DISTRICT JUDGE